UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>VINCENT RAY ROBERTS,<br>           Defendant. | Crim. No. 07-108 (RMU) |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTIONS TO SUPPRESS TANGIBLE EVIDENCE AND STATEMENTS[1]

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this opposition to defendant's Motions to Suppress Tangible Evidence and Statements. The government relies upon the points and authorities set out in this memorandum and at any hearing on this matter.

**I.   FACTS**

The defendant has been charged in a one count indictment with (1) Unlawful Possession with Intent to Distribute 100 Grams or More of Heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(i).

On March 26, 2007 at approximately 9:30 a.m., plain-clothed members of the Metropolitan Police Department's Drug Interdiction Unit – Detectives James Zerega and Barbara Lyles – were conducting interviews at the Greyhound Bus Station, located at 1005 First Street, Northeast, Washington, D.C. on a bus that had originated in New York City, stopped in Washington, DC to let some of the passengers off, and was then taking the remaining passengers to Memphis, Tennessee[2].

---

[1] The defendant has filed two separate motions, one to suppress tangible evidence and one to suppress statements. The government is filing a consolidated response to the defendant's two motions.

[2] These interviews consisted of the detectives approaching passengers and other civilians, and asking to speak with them. If the passenger or civilian agreed to speak

The detectives boarded the bus and began interviewing all the passengers who had re-boarded the bus and were continuing on to Memphis, Tennessee. Detective Lyles approached the defendant and introduced herself as a police officer and asked if she could speak with the defendant. The defendant agreed to speak with Detective Lyles, identified himself as Vincent Roberts and showed her his bus ticket to Memphis. Detective Lyles then went on to explain that she was a member of the Metropolitan Police Department's Drug Interdiction Unit. She asked the defendant if she could search his bag, and he consented. Detective Lyles searched his bag but did not find any contraband. Detective Lyles then asked the defendant if she could search his person. The defendant agreed to allow Detective Lyles to search him. Detective Lyles then advised the defendant that because she was a female officer she could not personally search the defendant, but that her male partner, Detective Zerega, could conduct the search. The defendant agreed to allow Detective Zerega to search him, at which point Detective Zerega began to pat down the defendant's waist area and felt a large, hard baseball sized object in the front of the defendant's waistband area. Detective Zerega then asked the defendant what it was that he was feeling, to which he responded responded that he did not know. Based on Detective Zerega's training and experience in narcotics trafficking and interdiction operations, he believed that the object he felt in the defendant's waistband was narcotics. Detective Zerega then handcuffed the defendant so that he could safely extract the object from the defendant's waistband. Detective Zerega then removed a plastic bag from the defendant's waistband. That bag contained inside of it two additional plastic bags. One of those two plastic

---

with the detectives, the detectives would engage the person in a brief conversation and might ask for permission to search the person's belongings for contraband. These passenger interviews occurred either on the bus or as passengers were getting off the bus.

bags contained a tan colored powder which field tested positively for heroin and weighed about 60 grams. The other plastic bag had five 1.5 inch long pellet shaped rubber condoms, each of which were each filled with a tan powder that field tested positive for heroin and weighed approximately 85 grams. Detective Zerega then advised the defendant that he was under arrest. After the defendant was placed under arrest but prior to being advised of his Miranda[3] rights, Detective Lyles asked the defendant what was in the plastic bags recovered from his waistband, and the defendant responded that it was heroin.[4]

## II.    ARGUMENT

Defendant is now moving to suppress the evidence seized from him and the statements that he made. Defendant claims that the police did not have probable cause to arrest him, and that therefore the stop, arrest and search of the defendant violated his Fourth Amendment Rights. Defendant also claims that none of the statements he made were voluntary and that any statements that he made were in response to custodial interrogation. Defendant's arguments should be rejected.

With respect to the tangible evidence, first, the initial encounter between defendant and the detectives was consensual. Second, the detectives asked for and defendant gave his consent for the detectives to search his bag and then his person, and the defendant never withdrew his consent. Finally, even if the defendant was arrested at the point he was handcuffed, the detectives had

---

[3]    384 U.S. 436 (1966).

[4]    As discussed further infra, the government does not intend to use this statement in its case-in-chief, but reserves the right to use the statement to impeach the defendant in cross examination should the defendant choose to testify. See Harris v. New York, 401 U.S. 222 (1971)

probable cause to arrest the defendant at that point based on feeling what they suspected to be narcotics in his waistband and continue their search of his personas a search incident to arrest.

With respect to the statements, all of the statements made by the defendant were made voluntarily, and his initial responses before being handcuffed were made before he was even in custody.

      **A.**      **Defendant's Initial Encounter with Detective Lyles Was Consensual.**

As the Supreme Court stated in <u>Florida v. Bostick</u>, 501 U.S. 429, 434 (1991), "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Indeed, the encounter is no more than a consensual contact as "long as a reasonable person would feel free to disregard the police and go about his business." <u>California v. Hodari D.</u>, 492 U.S. 621, 628 (1991). For a consensual encounter, law enforcement officers do not even need a reasonable suspicion. <u>Bostick</u>, 501 U.S. at 434. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." <u>Id.</u> (internal quotations omitted); see also <u>United States v. Drayton</u>, 536 U.S. 194, 201 (2002) ("If a reasonable person would feel free to terminate the encounter, then he or she has not been seized"). To determine when police conduct crosses from a consensual encounter to a seizure, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." <u>Bostick</u>, 501 U.S. at 437. In doing this analysis, courts look at such factors as the time of day, the place, the numbers of officers present, whether they were uniformed, whether any commands were given, what tone of voice was used in giving the commands, whether the individual was touched, whether the individual was threatened

or physically intimidated, and whether the officers' blocked the individual's path. U.S. v. Jones, 374 F. Supp. 2d 143, 148 (D.D.C. 2005).

In the instant case, the detectives' initial encounter with defendant was consensual. Indeed, in the early afternoon at 3:45 p.m., one plain-clothed detective approached defendant in a public place and asked to speak with defendant. The defendant agreed to speak with Detective Lyles. During that conversation, Detective Lyles spoke in a conversational tone, never displayed her weapon or touched defendant. The officer did not threaten defendant nor was he physically intimidating. Further, Detective Lyles did nothing to block defendant's path. Accordingly, this initial contact clearly was consensual.

### B.  Defendant Consented To The Search of His Bag And His Person.

During his conversation with defendant, Detective Lyles asked defendant whether she could search his bag. The defendant said yes and allowed Detective Lyles to search his bag. Following the search of the defendant's bag Detective Lyles asked the defendant if he would consent to a search of his person. Defendant said yes to that request and allowed Detective Zerega to search his person. Police may search items and persons without a warrant and without probable cause if given voluntary consent. Schneckloth v. Bustamonte, 412 U.S. 218 (1973). To determine whether consent was voluntarily given, the Court must examine the totality of the circumstances to determine whether the defendant's "will has been overborne and his capacity for self-determination critically impaired." See Schneckloth, 412 U.S. at 225; Connelly, 479 U.S. at 167 (1986). In making this determination, a district court must examine "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the [interaction]." Schneckloth, 412 U.S. at 226. Relevant factors include: 1) the age of the subject; 2) his or her lack of education or low

intelligence; 3) the lack of any advice on the subject regarding constitutional rights; 4) the length of detention; 5) the repeated and prolonged nature of questioning; and 6) the use of physical punishment.  Id. at 226-227.

The government expects that, if a hearing is held on this matter, the totality of circumstances would demonstrate that defendant's consent was voluntarily given. First, defendant's will was not overborne.  Indeed, at the time of the offense, defendant was a thirty year old man, who had completed approximately 10 years of education.  During a brief conversation with a plain-clothed detective in a public place, the defendant gave his consent to the search.  He did so having some familiarity with the criminal justice system, having been arrested at least four times since 1996 and convicted at least once at the time he was speaking with the officer.  Further, the defendant identifies no coercive police activity, and the circumstances of defendant's consent do not suggest that it was the product of coercive police activity, or was in any other way involuntary.

     **C.**    **The Officers had Probable Cause to Arrest Defendant.**

The Fourth Amendment permits police to make warrantless arrests based upon probable cause for felonies committed in their presence. United States v. Watson, 423 U.S. 411, 417-418 (1976).  Probable cause to arrest is viewed from the perspective of the police officer and it is a decision that is reviewed based upon the totality of the circumstances confronting the officer at the time of the events leading up to the arrest. Illinois v. Gates, 462 U.S. 213, 230-32 (1983).  Probable cause exists where the arresting officer possesses information "sufficient to warrant a prudent [person] in believing that the [suspect has] committed or [is] committing an offense." Beck v. Ohio, 379 U.S. 89, 91, (1964); see also United States v. Green, 670 F.2d 1148, 1152 (D.C.Cir.1981).

In United States v. Prandy-Binnet, 995 F.2d 1069, 1071 (D.C. Cir. 1993) Metropolitan Police Department officers conducting an interdiction operation at Union Station observed Defendant Prandy-Binett walking unusually quickly and acting nervous when he made eye-contact with the police officers. The officers approached the Defendant Prandy-Binnet and asked to speak with him. Defendant Prandy-Binnet agreed, at which point he gave numerous conflicting and evasive answers about where he had come from and where he lived. Defendant Prandy-Binnet showed the officers the inside contents of his bag, at which point the officers observed a small rectangular block wrapped in silver duct tape. To the officers, the size, shape and wrapping of the object signified one kilogram of illegal narcotics. The officers seizing that object from the defendant's bag placed Defendant Prandy-Binnet under arrest. The District of Columbia Circuit found that based on the totality of the circumstances, which included Defendant Prandy-Binnet's hurried walk and nervous demeanor when he made eye contact with the officers, his conflicting and evasive answers, seeing the duct tape wrapped rectangular brick in the defendant's bag, and the experience of the officers in narcotics trafficking, the police officers had probable cause to both seize silver duct taped brick and arrest the defendant. In making this finding the Court reasoned that "[l]aw enforcement officers naturally reach conclusions based on their training and experience. In cases of searches or seizures without warrants, the court's role is decide whether the officer's inference from the facts was 'reasonable'" (citation omitted). Prandy-Binett, 995 F.2d 1069, 1071; see also Dickerson v. Minnesota, 508 U.S. 366 (1993).

In this case, Detective Zerega felt a large, hard baseball sized object in the defendant's waistband that, based on his training and experience in narcotics trafficking, he believed was consistent with the shape and feel of narcotics and secreted in an area that he knew was a common

location for drug smugglers to hid narcotics. Additionally, the defendant gave evasive answers when asked about the hard object in his waistband. Based on the totality of the circumstances, the police had probable cause to further search and arrest the defendant.

**D.     The Officers Lawfully Searched Defendant Incident to His Arrest.**

After making a valid arrest, police may make a full search of the arrestee as well as the area under the arrestee's personal control at the time of the arrest. Chimel v. California, 395 U.S. 752, 763 (1969). A "search qualifies as incident to an arrest so long as it is an 'integral part' of the arrest." U.S. v. Tavolacci, 895 F.2d 1423, 1428 (D.C. Cir. 1990)(citation omitted). Such searches extend to "containers in hand or within reach when the arrest begins." Id. at 1429. In this case, the detectives placed the defendant in handcuffs after Detective Zerega felt what he believed to be narcotics in the defendant's waistband based on his training and experience. After handcuffing the defendant the detectives recovered from the defendant's waistband the plastic bags that contained the heroin.

**E.     Defendant's Statements Were Voluntarily Made.**

Defendant asserts that his statements were involuntary; thus, the government must establish by preponderance of the evidence that the statements were voluntary. See Lego v. Twomey, 404 U.S. 477, 489 (1972). To determine whether a statement was voluntarily made, this Court must examine the totality of the circumstances to determine whether the defendant's "will has been overborne and [her] capacity for self-determination critically impaired." See Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973); Colorado v. Connelly, 479 U.S. 157, 167 (1986). "Without a showing of coercive police activity . . . there is not a basis for concluding that [a defendant's] confession was involuntary . . . ." Martin v. United States, 567 A.2d 896, 908 (D.C. 1989).

8

The government expects that, if a hearing is held on this matter, the totality of circumstances would demonstrate that defendant's statement was voluntarily made, and that his will was not overborne. The defendant identifies no coercive police activity, and the circumstances of defendant's statement do not suggest that it was the product of coercive police activity, or was in any other way involuntary. In fact, the defendant was approached in a public setting by plain clothed detectives who asked if they could speak with him and then asked for permission to search both his bag and his person. The defendant agreed to speak with the detectives, and during that conversation the detectives spoke in a conversational tone, and never displayed their weapons. The detectives did not threaten the defendant nor was he physically intimidating. Moreover, all of the defendant' statements were voluntary. There is no evidence to suggest that the circumstances of the defendant' stop were particularly intrusive. Accordingly, the defendant's statements were not unlawfully obtained.

In cases with much starker circumstances than those in this case, the courts have found statements to be voluntary. See, e.g., Bliss v. United States, 445 A.2d 625, 631-32 (D.C. 1982) (defendant was in pain from gunshot wound, had little food or sleep, but it was a flesh wound, there was little blood, and he was able to answer questions), cert. denied, 459 U.S. 1117 (1983); Harris v. Dugger, 874 F.2d 756, 759-62 (11th Cir.) (confession voluntary even though defendant in forearm cast and handcuffed during six-hour interrogation), cert. denied, 493 U.S. 1011 (1989); United States v. Leon Guerrero, 847 F.2d 1363, 1368 (9th Cir. 1988) (promises that cooperation would be communicated to prosecutors insufficient to overcome will); United States v. Yunis, 273 U.S. App. D.C. 290, 298, 859 F.2d 953, 961 (1988) (defendant's seasickness, his uncomfortably hot room, and his unfamiliarity with American legal culture not a legally adequate basis for concluding that

confession was involuntary); United States v. Pelton, 835 F.2d 1067 (4th Cir. 1987) (FBI agent's assertion that agent would launch full-scale investigation if defendant did not cooperate not sufficient to render statements involuntary), cert. denied, 486 U.S. 1010 (1988).

**F.      Defendant's Statements Made Pre-Arrest Do Not Violate Miranda.[5]**

The Government concedes that the defendant's admission that the substance found in his waistband was heroin was made after he was placed under arrest and prior to being advised of his Miranda rights and in response to police questioning. The government, however, reserves the right to use that admission in cross examination to impeach the defendant should he testify at trial. See Harris v. New York, 401 U.S. 222 (1971).

Defendant argues that his other statements were taken in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). The strictures of Miranda apply to statements which are the product of custodial interrogation. See Calaway v. United States, 408 A.2d 1220, 1224 (D.C. 1979). For purposes of Miranda, a suspect is in custody only if the there is "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) (internal citations and quotations omitted). A suspect in such a situation must be informed of his right to refuse to answer any statements; the failure to do so will lead to the suppression of any statements that suspect makes. Dickerson v. United States, 530 U.S. 428 (2000).

---

[5]  The Government concedes that the admission by the defendant that the substance found in his waistband was heroin was made after he was placed under arrest and prior to being advised on his Miranda rights and can be therefore be considered to be in response to custodial interrogation.

The defendant was not in custody when he responded to Detective Lyle's initial questions and Detective Zerega's questions regarding the hard baseball sized object that he felt in the defendant's waistband during a consensual search of the defendant. Rather, the detective had agreed to speak with the detectives and had further consented to a search of his bag and his person. The defendant was not "subjected to restraints comparable to those associated with a formal arrest." See Berkemer v. McCarty, 468 U.S. 420, 441 (1984). For all these reasons, the defendant was not in any form of custody, and Miranda does not apply.

The District of Columbia Circuit Court of Appeals concluded that Miranda did not apply in a similar situation:

> Beckwith does not and could not reasonably assert that his interrogation was in custodial circumstances. While the meaning of 'custodial' circumstances can include interrogation at a private home, it does not always. Rather the test is whether the suspect 'has been taken into custody or otherwise deprived of his freedom in any significant way.' Here Beckwith was neither arrested nor detained against his will. He was not subject to formal interrogation before a grand jury. The record reflects no use of any police interrogation techniques or any sort of browbeating. He was free to leave at any time and in fact was out of the agents' presence more than once. Indeed, one of Beckwith's complaints is that the meeting was so friendly that he was deceived into believing that he was not incriminating himself. United States v. Beckwith, 510 F.2d 741, 742 (1975).

The Supreme Court affirmed the holding in that case in Beckwith v. United States, 425 U.S. 341, 347-48 (1976):

> An interview with Government agents in a situation such as the one shown by this record simply does not present the elements which the Miranda Court found so inherently coercive as to require its holding. Although the "focus" of an investigation may indeed have been on Beckwith at the time of the interview in the sense that it was his tax liability which was under scrutiny, he hardly found himself in the custodial situation described by the Miranda Court as the basis for its holding. Miranda implicitly defined "focus," for its purposes, as questioning initiated by law enforcement officers After a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. It may well be true, as petitioner contends that the "starting point" for the criminal prosecution was the

information obtained from petitioner and the records exhibited by him. But this amounts to no more than saying that a tax return signed by a taxpayer can be the "starting point" for a prosecution. (quotations and citations omitted.)

Thus, because the defendant in the instant case was not under any form of custody at the time she provided his oral and written statements to law enforcement, <u>Miranda</u> does not apply to the instant situation.

WHEREFORE, the United States respectfully submits that defendant's motions to suppress tangible evidence and statements should be denied.

>Respectfully submitted,
>JEFFREY TAYLOR
>United States Attorney
>
>_____/s/_____
>Louis Ramos
>Assistant United States Attorney
>D.C. Bar No. 472-176
>555 4th Street, N.W.
>Washington, DC 20004
>(202) 305-2195; Fax: 514-6010

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>VINCENT RAY ROBERTS,<br>    Defendant. | Crim. No. 07-108 (RMU) |

**ORDER**

Upon consideration of Defendant's Motion to Suppress Tangible Evidence and finding good cause shown, it is this _____ day of _____, 2007, hereby

Ordered that the motion is DENIED.

_____
THE HONORABLE RICARDO M. URBINA